UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| D.R.D., individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>Nation Medical Inc. d/b/a TRT Nation,<br><br>    Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff D.R.D. ("Plaintiff"), on behalf of himself and all others similarly situated (the "Class Members"), asserts the following against Defendant Nation Medical Inc. d/b/a TRT Nation ("TRT Nation" or "Defendant"), based upon personal knowledge and, where applicable, on information and belief through the investigation of counsel.

**NATURE OF THE ACTION**

1.      This is a class action lawsuit brought on behalf of all patients who used https://trtnation.com/ (the "Website") to purchase prescription medication(s) and/or lab testing services through the Website.

2.      TRT Nation is an online telehealth clinic through which patients can purchase prescription medications for testosterone therapy, HCG therapy, HGH Peptides, and laboratory testing services.[1]  The Website offers patients convenient and discrete access to prescription medications for the treatment of said conditions.

3.      Information concerning an individual's healthcare and prescription medication is

---

[1] https://trtnation.com/ (last visited 7/16/25).

sensitive health information over which individuals have a reasonable expectation of privacy. Unbeknownst to Plaintiff and Class Members, this sensitive, personal information communicated through the Website was intercepted by one of the largest advertising companies in the country, Google LLC ("Google").  TRT Nation aided, employed, agreed, and conspired with Google to intercept sensitive and confidential personal and medical communications sent by patients seeking prescription medications and services from Defendant.  This was a serious invasion of privacy divulging deeply personal aspects of individuals' lives.  The interception of patient communications and prescription information was particularly egregious because it included highly sensitive details such as the specific medical conditions, treatment, and prescription medications used by Plaintiff and class members.

4.      Defendant chose to implement Google Analytics on its Website, which functioned to transmit private user interactions on the Website to Google, including confidential prescription purchases and personally identifiable information ("PII") from Plaintiff and Class Members.

5.      Plaintiff and Class Members provided their personal information, including prescription information, to Defendant, with the expectation that this information would remain confidential and private.  Defendant's agreement with Google to permit the interception of this information without explicit consent constitutes an extreme invasion of Plaintiff's and Class Members' privacy.

6.      Plaintiff brings this action individually and on behalf of the Classes (defined below) for: (i) violation of the Maryland Wiretapping and Electronic Surveillance Act, Md. Code, Cts. & Jud. Proc. Code Sec. 10-401, *et seq*.; (ii) violation of common law invasion of privacy – intrusion upon seclusion; and (iii) unjust enrichment.

**PARTIES**

7.     Plaintiff is a Maryland resident and was in Maryland when he accessed the Website, obtained medical services from Defendant, and purchased prescription medication from Defendant.

8.     On at least one occasion, Plaintiff used the Website to purchase prescription testosterone replacement therapy medication and associated laboratory testing. Unbeknownst to Plaintiff, and with Defendant's assistance and approval, Google intercepted Plaintiff's information related to his prescription medications through its proprietary software codes which Defendant knowingly included and integrated into its Website, as described more thoroughly below.  Due to the surreptitious nature of the interceptions at issue, Plaintiff did not realize confidential information related to his medical prescriptions was disclosed to third parties (like Google) until June 2025.  Plaintiff was in Maryland when he ordered the above-mentioned prescription medications through the Website.

9.     In addition to information related to his prescription medications, Defendant also aided Google in intercepting Plaintiff's PII, including his unique Google ID which is personally identifiable and in fact identified Plaintiff to Google.  Defendant permitted Google to intercept Plaintiff's personally identifiable information related to his purchase of prescription medications and medical services.

10.     Google, with Defendant's assistance and agreement, committed the interceptions at issue without Plaintiff's knowledge, consent, or express written authorization.

11.     After visiting the Website, Plaintiff was retargeted with advertising for similar medications.

12.     By failing to receive the requisite consent, Defendant aided Google in unlawfully

3

intercepting Plaintiff's PII and information related to his purchase of testosterone therapy, HCG therapy, HGH Peptides, and laboratory testing services.

13.      Such acts are egregious violations of Plaintiff's right to privacy.

14.      Defendant TRT Nation is incorporated in the State of Florida and maintains a principal place of business at 12602 Telecom Drive, Tampa, Florida 33637.  Defendant owns and operates the Website.  Defendant provides telehealth services and offers prescription medications for purchase on the Website.  Defendant embedded tracking software known as Google Analytics on its Website, among other tracking software owned by Google, as described in more detail below. Defendant embedded this tracking technology on its Website for advertising purposes.

## JURISDICTION AND VENUE

15.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

16.      This Court has personal jurisdiction over Defendant because Plaintiff's claims arise out of Defendant's forum-based activities, namely selling prescription medication through the Website into Maryland.

17.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District.

## FACTUAL BACKGROUND

I.      **Defendant's Website Discloses Confidential Health and Prescription Information**

18.      Defendant is a telehealth provider.  Through its Website, Defendant offers prescription medications for testosterone therapy, HCG therapy, HGH Peptides, and laboratory

testing services.

19.    When patients visit the Website, they are brought to Defendant's homepage, which solicits them to order a prescription medication through the prompt "Get Started," as shown in Figure 1, below.

**<u>Figure 1:</u>**



20.    After clicking "Get Started," the patient is then brought to a screen in which they are prompted to insert their name, email, and phone number, as shown in Figure 2, below.

**<u>Figure 2:</u>**



21.     After inputting the required information, the patient is then prompted to (1) select a particular prescription medication; (2) order bloodwork/lab testing; (3) checkout; and (4) gain access to Defendant's portal and schedule a meeting with a medical provider, as set forth in Figure 3, below.

**Figure 3:**



22.     The patient proceeds through this process to purchase, and in doing so selects a

particular prescription medication available in his or her state (as depicted in Figure 4 below), selects lab work for purchase or specifies that he or she already has lab work (as depicted in Figure 5, below), provides patient information (as depicted in Figure 6 below), and finally provides billing and shipping information.

**Figure 4:**



**Figure 5:**



**Figure 6**:

Should you require assistance with enrollment at any time please contact our support team at 813-413-1000

23.      After providing the required PII to Defendant, the patient can then proceed to purchase the selected prescription medication, as well as lab testing or other incidental medical services.

24.      At no point during this process are patients alerted that information related to their prescription medication will be intercepted by third parties such as Google.  At no point does

Defendant alert patients that it is using Google Analytics to assist Google with intercepting information related to their prescription medication.

25.    Unbeknownst to its patients, Defendant assists Google in intercepting information related to their purchase of prescription medication.  The backend transmission from Defendant to Google is depicted in Figure 7, below.

**Figure 7:**



26.    As shown in Figure 7, Defendant's backend transmission of data to Google

10

includes information that a patient is purchasing prescription medication through the Website, in this example testosterone replacement therapy medication, which is the same medication purchased by Plaintiff on the Website. Similar transmissions occurred regardless of the specific prescription purchased by the customer. This information is personally identifiable through, at minimum, the user's unique Google ID which serves to identify the user personally to Google.

27.     Defendant aids Google in intercepting this confidential information through Google Analytics, which Defendant knowingly implemented into its Website. Google Analytics is not necessary for Defendant's Website to function.

28.     Each time Defendant sent this activity data using Google Analytics, it also disclosed, at minimum, a patient's unique Google ID.

29.     Defendant boasts to customers that it is HIPAA complaint, when in fact it is not because it unlawfully aids Google in surreptitiously collecting Plaintiffs' and class members' personally identifiable prescription information. Indeed, while filling out the form fields depicted in Figures 4-6, Defendant boasts in a banner below the form fields that the process is "HIPAA Compliant," as depicted in Figure 8, below:

**Figure 8:**

   

## II.     Google's Tracking Technology on Defendant's Website

30.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google, at its core, is an advertising company.

31.     Google "make[s] money" from "advertising products [that] deliver relevant ads at

just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[2]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenue from advertising in prior years:

**Figure 9:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

32.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

33.     One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and

---

[2] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

accuracy.

34.    Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

35.    In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

36.    Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

37.    Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[3]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[4]

38.    Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site.  This

---

[3] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).

[4] *Id.*

13

code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects PII.

39. As discussed, *supra*, Defendant directly discloses to Google the specific medications purchased by patients on its Website.

40. Once Google's software code collects the data, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

41. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that the user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities)).

42. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users. Google Analytics links with Google Ads, allowing the data intercepted by Google Analytics to be utilized for targeted advertising purposes.

43. The Website utilizes Google's pixel and/or SDK. As a result, Google intercepted patients' interactions on the Website, including their personally identifiable prescription

information.  Google received at least "Custom Events" and URLs that disclosed the name of the prescription medication purchased.  Google also received, at minimum, Plaintiff's and class members' unique Google ID that is sufficient for Google to personally identify the user.

44.     Plaintiffs and Class Members provided their prescription medication information and other sensitive data to Defendant to obtain medical prescriptions. This information was intercepted by Google without Plaintiff's consent or knowledge.

45.     Plaintiff and Class Members have a reasonable expectation of privacy in their personally identifiable prescription information and health information, including information related to their purchase of prescription medications for treatment of health conditions.

### III.    Plaintiff's Personally Identifiable Health Information is Property, Has Economic Value, and its Illicit Interception Caused Economic Harm.

46.     It is common knowledge in the industry that there is an economic market for consumers' personal data—including medical information and other sensitive data that was intercepted through Google Analytics.

47.     For instance, according to Experian, health data is a "gold mine" for health care companies and clinicians.

48.     In 2013, the Financial Times reported that the data-broker industry profits from the trade of thousands of details about individuals, and within that context, "age, gender and location" information are sold for about "$0.50 per 1,000 people." This estimate was based upon "industry pricing data viewed by the Financial Times," at the time.

49.     In 2015, TechCrunch reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name." That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data

(within the corporate acquisition context) can vary from $15 to more than $40 per user.

50.    Notably, a 2021 report from Invisibly found that personal medical information is one of the most valuable pieces of data within this data market. "It's worth acknowledging that because health care records often feature a more complete collection of the patient's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves.  While a single social security number might go for $0.53, a complete health care record sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, healthcare breaches increased 55% in 2020."  The article noted the following breakdown in average price for record type:

| Record Type | Average Price |
| --- | --- |
| Health Care Record | $250.15 |
| Payment Card Details | $5.40 |
| Banking Records | $4.12 |
| Access Credentials | $0.95 |
| Social Security Number | $0.53 |
| Credit Record | $0.31 |
| Basic PII | $0.03 |

51.    The Federal Trade Commission has also confirmed the value of user data and, particularly, health information.  It found back in 2014 that data brokers sell data that categorize users into sensitive categories, such as "expectant parent."  It recently sued one of these companies for selling location data on people who visit abortion clinics for approximately $160 a week.

52.    Furthermore, individuals can sell or monetize their own data if they so choose.  A myriad of companies and apps such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for their personal data.

53.    Given the monetary value already assigned to personal information, Defendant

has deprived Plaintiff and Class Members of the economic value of their health information by causing the interception and transmittal of such data without providing proper consideration for Plaintiff's and Class Members' property.

## CLASS ACTION ALLEGATIONS

54. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of a class defined as all natural persons in the United States who, during the class period, purchased medication on the Website ("Nationwide Class").

55. Plaintiff also seeks to represent a subclass defined as all natural persons in Maryland who, during the class period, purchased medication on the Website ("Maryland Class"). The Nationwide Class and Maryland Class are collectively referred to herein as the Classes.

56. Excluded from the Classes are Defendant and its subsidiaries and affiliates; all employees of Defendant and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Classes; Plaintiff's counsel and Defendant's counsel and members of their immediate families; and any judge to whom this case is assigned, including his/her immediate family and court staff.

57. **Numerosity**: The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While Plaintiff is informed and believes that there are likely tens of thousands of members of the Classes, the precise number of Class Members is unknown to Plaintiff. Class Members may be identified through objective means, including Defendant's own records. Class Members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

58. **Commonality and Predominance**: This action involves common questions of

law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

a.  Whether Defendant's acts and practices violated the Maryland Wiretapping and Electronic Surveillance Act, Md. Code, Cts. & Jud. Proc. Code Sec. 10-401, *et seq*.;

b.  Whether Defendant's conduct in aiding and agreeing with Google to intercept Plaintiff's and Class Members' personally identifiable health information gives rise to a privacy violation;

c.  Whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and,

d.  Whether Plaintiff and the Class Members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

59.     **Typicality**: Plaintiff is a member of the Classes.  Plaintiff's claims are typical of the claims of all Class Members because, like other Class Members, Plaintiff's communications with Defendant, including his sensitive medical information, were intercepted by third parties such as Google because of Defendant embedding Google Analytics on its Website.

60.     **Adequacy of Representation**: Plaintiff is an adequate class representative because he is a member of the Classes, and his interests do not conflict with the interests of other Class Members that he seeks to represent.  Plaintiff is committed to pursuing this matter on behalf of the Classes with the Classes' collective best interest in mind.  Plaintiff has retained counsel competent and experienced in complex class action litigation of this type, and Plaintiff intends to prosecute this action vigorously.  Plaintiff, and his counsel, will fairly and adequately protect the Classes' interests.

61.     **Predominance and Superiority**: As described above, common issues of law or

18

fact predominate over individual issues.  Resolution of those common issues in Plaintiff's case will also resolve them for the Classes' claims.  In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, and it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.  Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

62.     Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

### TOLLING, CONCEALMENT, AND ESTOPPEL

63.     The applicable statutes of limitation have been tolled because of Defendant's knowing and active concealment and denial of the facts alleged herein.

64.     Defendant secretly incorporated Google Analytics into its Website, providing no indication to users that their private health-related information would be intercepted by or shared with Google.

65.     Defendant had exclusive knowledge that Google Analytics was incorporated on

its Website yet failed to disclose that fact to users.  Defendant also failed to disclose that by interacting with its Website, Plaintiff's and Class Members' sensitive prescription medication information would be intercepted and shared with Google.

66.	Plaintiff and Class Members could not, with due diligence, have discovered the full scope of Defendant's conduct, including because the incorporation of Google Analytics is highly technical and there were no disclosures or other indications that would inform a reasonable consumer that Defendant procured Google to intercept sensitive medical information such as prescription medication information.

67.	The earliest Plaintiff could have known about Defendant's conduct was June 2025.

68.	Defendant was under a duty to disclose the nature and significance of its data disclosure practices but did not do so.  Defendant is therefore estopped from relying on any statute of limitations under the discovery rule.

69.	Additionally, Defendant engaged in fraudulent conduct to prevent Plaintiff and Class Members from discovering the disclosure and interception of their PII and health-related information.  Defendant misled Plaintiff and Class Members to believe their health information and PII would not be disclosed or intercepted.  Specifically, Defendant stated to Plaintiff and Class members that it adhered to HIPAA's requirements, which led Plaintiff and Class Members to believe that their information would be safeguarded, when in fact Defendant exposed Plaintiff's and Class Members' health-related information.

70.	Plaintiff and Class Members were not aware that Defendant caused the interception of their PII and health information.

71.	Plaintiff and Class Members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Defendant's misconduct by virtue of

its fraudulent concealment.

72. Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the Maryland Wiretapping and Electronic Surveillance Act**
**Md. Code, Cts. & Jud. Proc. Code Sec. 10-401, *et seq*.**

73. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

74. Plaintiff brings this claim against Defendant individually and on behalf of the Maryland Class.

75. Maryland's Wiretapping and Electronic Surveillance Act ("MWESA") makes it unlawful to: (1) willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; (2) willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or (3) willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication." Md. Cts. & Jud. Proc. Code Sec. 10-402.

76. Under the MWESA, "willfully" is defined as "an intentional violation or a reckless disregard of a known legal duty." *Benford v. Am. Broadcasting Co.*, 649 F. Supp. 9, 10 (D. Md. 1986).

77. "Electronic Communication" is defined as "[a]ny transfer of signals, writings,

21

images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." Md. Code. Cts. & Jud. Proc. Sec. 10-401(5)(i).

78. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Md. Code Cts. & Jud. Proc. Sec. 10-401(4).

79. "Contents" is defined as "any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication." Md. Code Cts. & Jud. Proc. Sec. 10-401(7).

80. Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose or use, a wire, electronic, or oral communication in violation of Maryland's Wiretap Act is subject to a civil action for: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs incurred. Md. Cts. & Jud. Proc. Code § 10-410.

81. At all relevant times, Defendant procured Google to track and intercept Plaintiff's and Class members' internet communications while navigating the Website. They intercepted these communications without authorization and consent from Plaintiff and Class members.

82. Defendant, when procuring Google to intercept Plaintiff's communications, intended Google to learn the meaning of the content the visitor requested.

83. As alleged above, Google intercepted Plaintiff's and Maryland Class members' electronic communications, including information that contained health-related information, including personally identifiable prescription information.

22

84.     Plaintiff's and Maryland Class members' electronic communications were intercepted in Maryland.

85.     Defendant sought to profit and in fact did profit off the interception of Plaintiff's and the Maryland Class members' electronic communications while intentionally or recklessly disregarding its own legal duty.

86.     The interception of Plaintiff's and Maryland Class members personally identifiable prescription information constitutes an invasion of privacy sufficient to confer Article III standing.

87.     Plaintiff and Maryland Class members seek all relief available under Md. Code Cts. & Jud. Proc. Secs. 10-410(a)(1)-(3), including statutory damages of $100 per day for each day or violation or $1,000, whichever is higher, punitive damages, and reasonable attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF
### Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion

88.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

89.     Plaintiff brings this claim against Defendant individually and on behalf of the Maryland Class.

90.     Defendant's procurement of Google to intercept Plaintiff's and Class Members' information about their purchase of prescription medications, and other sensitive medical information constitutes an intentional intrusion upon Plaintiff's and Class Members' privacy, seclusion, and private affairs.  Defendant caused the interception of said information, which was intended to stay private, namely sensitive medical information and prescription information, without users' consent.

23

91.     Plaintiff and Class Members had a reasonable expectation of privacy in their personally identifiable medical information.  Plaintiff's and Class Members' medical information is inherently sensitive in nature and protected by law.  Plaintiff and Class Members reasonably expected this information would remain private and confidential and would not be disclosed to third parties without their consent.

92.     There was no indication provided by Defendant that Google Analytics was embedded on the Website or that it would intercept Plaintiff's and Class Members' sensitive medical information when they interacted with the Website.

93.     Plaintiff and Class Members did not consent to, authorize, or know about Defendant's intrusion at the time it occurred.  Accordingly, Plaintiff and Class Members never agreed that Defendant could intercept their data or cause the interception of their data on behalf of third parties.

94.     The surreptitious taking and disclosure of sensitive medical information and prescription information, from thousands of individuals, was highly offensive because it violated expectations of privacy that have been established by social norms.

95.     Defendant decided to implement Google Analytics on its Website knowing that it was procuring Google to intercept Plaintiff and Class Members' private communications with the Website.  Therefore, Defendant acted intentionally.

96.     The offensiveness of this conduct is even more apparent because Defendant's disclosure of this information was conducted in secret in a manner that Plaintiff and Class Members would be unable to detect through the seamless incorporation of Google Analytics, which operates wholly behind the scenes while Plaintiff and Class members were interacting with the Website.

97.    Accordingly, Defendant's interception of Plaintiff's and Class members' sensitive medical information would be (and in fact is) highly offensive to a reasonable person.

98.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

99.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

100.    Plaintiff and Class Members seek appropriate relief for their injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant because of its intrusions upon Plaintiff's and Class Members' privacy.

101.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

102.    Plaintiff also seeks such other relief as the Court may deem just and proper.

### THIRD CLAIM FOR RELIEF
**Unjust Enrichment**

103.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

104.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of valuable personally identifiable medical information, which Defendant collected from Plaintiff and Class Members under the guise of keeping this information private.  Defendant voluntarily collected, used, and procured the interception of such information for its own gain, including

25

advertisement purposes or sale.  Additionally, Plaintiff and Class Members conferred a benefit upon Defendant in the form of monetary compensation.

105.    Plaintiff and Class Members would not have used Defendant's services, or would have paid less for these services, if they had known Defendant would use and disclose this information.

106.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class Members.

107.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members.  It would be inequitable for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

108.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, respectfully requests that the Court enter an order:

a.  Certifying this case as a Class action on behalf of the Classes defined above, appointing Plaintiff as the representative of the Classes, and appointing Plaintiff's counsel as the Class counsel;

b.  Declaring that Defendant's conduct, as set out above, violates the laws cited herein;

c.  Awarding damages, including nominal, statutory, and punitive damages where applicable,

to Plaintiff and the Classes in an amount to be determined at trial;

d.  Awarding Plaintiff and the Classes equitable relief including restitution and disgorgement

of unlawfully obtained profits;

e.  Awarding Plaintiff and the Classes their reasonable litigation expenses and attorneys' fees;

f.  Awarding Plaintiff and the Classes pre-and post-judgment interest, to the extent allowable;

g.  Awarding such other further injunctive and declaratory relief as is necessary to protect the

interests of Plaintiff and the Classes; and

h.  Awarding such other and further relief as the Court deems reasonable and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of himself and the proposed Classes, demands a trial by jury for all of

the claims asserted in this Complaint so triable.

Dated:  November 4, 2025

/s/ Nathaniel K. Risch
Nathaniel K. Risch


**MANN & RISCH, LLC**
Nathaniel K. Risch
101 E. Chesapeake Ave., Ste. 403
Towson, MD 21286
Telephone: (410) 929-5145
Facsimile: (410) 307-1007
E-Mail: nate@mannrisch.com

**BURSOR & FISHER, P.A.**
Alec Leslie (*pro hac vice* forthcoming)
Andrew Obergfell (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com
                aobergfell@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 2100

Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Attorneys for Plaintiff*